The case up this morning is 413-0227, Quarling-McCormick, LLC, Jeffress v. TLG Mopac, et al. For the appellant is Craig Randall, you are he, sir? Yes, sir. The appellee, Teresa Phelps. Mr. Randall, you may proceed, sir. Thank you, Your Honor. May it please the Court, Phelps. Counsel. In reviewing for the argument, and reviewing the briefs in this case, there are 65 pages of arguments. 65 what? Of the 65 pages, five of them, and by the way, most of the cases cited by both sides stand for basic principles of contract law, which both briefs seem to agree on. I'd like to focus on what I believe only five pages of the brief were spent on, but I think are dispositive in this case. This is a negotiated agreement in the context of a separate agreement whereby the defendant acquired 100% of the membership interest of the Parkside LLC formed by my client. That was how this transaction was structured, so that there would be a dichotomy between the ownership of the building, which would remain in the LLC that acquired it, and the 100% ownership would be with TLG, the entity. Now, the contract was very specific in a number of details. Part of the deal was that the TLG would acquire or take it subject to a mortgage, specifically referenced a dollar amount with a credit against the purchase price for any money balance due on a mortgage at the time of closing over and above the agreed amount. Everything was in detail. Now, the key is the agreement we're talking about was not a part of the transaction in the sense of how it was to be transferred. It was the third element of what my client says the sellers were to receive as compensation for this LLC, which owned the old Union Pacific Railroad building in downtown St. Louis. They received a cash payment, they received a mortgage, and each of them received the identical agreement. Now, there is some suggestion in the briefs that this wasn't going to be an acquisition where TLG was going to receive 100% of the beneficial interest. But if you look at both the amendment to the original redemption agreement and you look at the closing, they were all signed simultaneously, all contained the identical language, and they were all part of the function whereby TLG would own 100% of the beneficial interest. I mention this because in specifying how this third element of consideration would be calculated, they defined a term called company affiliate, and in company affiliate they included all the members of the LLC that was being acquired and also referred to all the owners of the LLC that was being acquired. They determined that the methodology for this third element of consideration that they were going to receive for their beneficial interest in the land trust is the profits and financial benefits to be received by any of these company affiliates, which at that time, the contemplated company affiliate was going to be the TLG entity that was going to own 100% of the beneficial interest. But they went further and they said, because there's some dispute in the briefs about, well, you can't show there was any profit. They didn't use profit in the general sense of the dictionary definition. It was one of the few terms we discussed in these briefs that was specifically defined. What they said is that these shall be the profits derived from, as set forth in the terms of the agreement. That set out in the very first paragraph, wherein they defined three specific circumstances, each one having a separate calculation as to what the payout share, that was the term used, would be, because it would be upon the terms and conditions provided in the agreement. And where the term is defined, we don't have to look beyond that. We don't have to see what they mean by terms and financial benefits because the parties defined it. And the first one is the 19 words we're defining here. They were to receive 25% of the value of any property distribution received by a company affiliate from company. Now there's also the I.E. condominium units, which I'm sure we'll get to here shortly. But essentially what it said is that if you transfer the property, I mean we're starting out with the only asset we have here is this building. That's what it knows in the parking lot. If you transfer the building to any of these company affiliates, and again there's no dispute that TLG was a company affiliate, it was the sole member, then you will pay us 25% of its value. Now that is exactly what occurred here. Counsel, does it matter that the agreement with respect to the payout share uses the term value of any property distributions versus you're talking about transfers? No, Your Honor, I don't think so because of the agreement looked at as a whole. The unique thing about the language of the first one as opposed to the very specific language of the second and third element of categories is that those two categories were quite careful to say that in the payments defined would be exclusive of reimbursements. That is costs advanced. Essentially the payments to be calculated would be net payments. Both paragraph two and paragraph three are very explicit on that point. In this case there is no reference to subject to a mortgage, liens, or any matter other than the value of the property. The term net value isn't used and the reason, it has been suggested that it mirrors speculation, but one has to look at the consequence of what paragraph one contemplates. The transfer of the sole asset of this LLC to one of its members and at that point it is essentially game over as far as receiving any more money. The potential being that with that transfer then they own the assets. In structuring this particular provision, because provisions can be structured for a lot of reasons, one of which is to attain value and frankly one of which is to provide a deterrent to a very difficult situation that may occur. The exact situation we have here. A transfer in a manner where essentially the asset is transferred, but they are maintaining that it wasn't transferred. Now the issues that come up with the transfer like this are numerous. One of which is, and we are getting to that, is the value of the property. We get back to this net value thing. Both sides have pointed out the fact that if you own 100% of the beneficial interest of an entity, you can pretty much do anything you want with the entity or its assets. But you don't own those assets. Both Missouri law and Illinois law are quite specific that the membership interest is not an ownership interest in the LLC's property. What this lends itself to and the reason, and one of the things in the context of this is that old adage about I'd rather ask for forgiveness than permission. One of the problems here is that if you look at it at the time it was drafted, one of the concerns and one of the reasons it was drafted this way so that it was the value of the property is the potential. For the 100% owner that would have the right to borrow money independently, use the LLC's property as security, and then transfer it, pay down some or all of the mortgage, sell it for value or even a shortfall on the mortgage, and whatever be left, whatever proceeds those owners received from that loan would have passed to them independently. It would have just been loan proceeds. And you could circumvent the value of the transfer of the billing. Again, looking at this, much of the Appellee's approach is to look at this in hindsight. But that wasn't what any of the parties did. They were looking in foresight and they were hedging against this very condition. Not so that it would be looked at in hindsight as, oh, that's harsh and untenable, but in part to keep them from doing it. Well, has your client lost their interest in the property? Well, they didn't retain an interest in the property. But I mean, this contract and these terms, doesn't that still give them rights to any distribution in the future of even after this merger? It could, but the problem is we don't know that now. That's why this condition was put in here. I understand what you're saying. And basically, it's akin to the argument that the Appellates are making as well. Yeah, you told me not to use the car, I used it, but I didn't wreck it, so no harm, no foul. But the problem with that is it now creates, and counsel in her brief points out, there are other lawsuits pending to try to track down. Because what we don't know in this transaction is who got the proceeds of the mortgage? Where did they go? Have they been spent? Who owns them now? Frankly, the potential, and again, that's the issue. They invoked Paragraph 1, and this was not trusted. They invoked it and chose to do this in furtherance of, as they point out, we had a business interest to do it, so we just did it. Well, of course they had the right to do that, but they took the consequence of that event with them. So, one of the potentials we have is, and again, which may be an issue of a subsequent lawsuit if this opinion is affirmed, is who now owns TLG? Who are the people, are they the same, or can they now make distributions to other people, or payments to other people, or pay for services to other people, who have these interests, that are independent of TLG? Because now, instead of the known quantity, we have new ownership of this asset. And that's why, in looking at it, where it's easy to get confused, is this hindsight approach. Well, you can't show that anything bad happened, so even if we violated it, it doesn't make any difference. The test of what that meant is when it was written. And frankly, it would appear that the provision was intended to, in part, keep this from happening. Because this is the most complex situation to sort out. That's why it is simple. Is my understanding correct, counsel, that the trial court found no property distribution occurred in this case, because no property was transferred? That was the court's finding, Your Honor. Where did the court err, and so conclude? The property is, you know, even in the opinions that were cited, there's some opinions, Missouri opinions, cited by the appellants regarding a merger in the context of a penalty clause, if you will, which allowed to terminate a contract if it was assigned. Even in those cases, the court found, and those cases were, in fact, based upon the fact that there was a transfer of property. The Missouri statute is expressed that the effect of the merger is to transfer all of the property of the merging entities to, without further transaction, and it specifically references without deed or any further action by operation of law, it transfers the property. So, in that sense, Your Honor, I believe, with all due respect to the trial court, that that was error in the context of the Missouri statute. The opinion here, it's not that they don't own the asset, because there's no question they own the asset. The new entity could turn around and sell it today. They don't need another deed, they don't need anything else. The merger document effectuated their ownership. A very different status than when this transaction was originally entered into, and the way it was intended to function with this dichotomy. And the change of the dichotomy had the specifically defined effect. Now, again, if we don't look at it in context, what that says is, okay, if you transfer the property, we're not going to look behind it, we're not going to look at what the mortgage is, we're not going to look at what you did with the money. If you elect to do that, then that's it. You owe us 25% of the value of the property, and in one case, I think it's eight and a third, something like that, in the case of Mr. Jefferson, that triggers the payout share. Now, again, the hard part is the argument that, well, this is harsh, it's unfair, we didn't net any profit as profit is defined in the dictionary. Profit as it's defined in the dictionary was not what these parties agreed to. They had specific events, each of which gave rise to a different percentage, a different calculation, and both the original agreement and two of the three factors giving rise to the seller's payout share all provided for net payments. When they did the deal, they said, to the penny, if it exceeds that, we get a dollar for dollar setup. None of that appears in this section. Now, the only argument that's made is the, which I found unfortunate, the IEEG argument, as though this whole value issue was going to be limited to if and when condominium units were used. That was going to be the method of development. Now, the problem with that is that, first off, the term EG doesn't really, it essentially says EG, and that is it's a redundancy. It's the length, the term of the contract, 96 months. Okay, it's the same thing. In this case, they used the broadest possible term, any property distribution, and the Applees argue that, but that really meant only condominium units. Now, this would be the ultimate, and we're willing to interpret that, even if there was an affidavit from an individual saying that was the context when we were negotiating. Well, this has a merger clause. It doesn't matter what the negotiations were, but the point is, even if they were going to develop it into condominium units, under that argument, they could still transfer the whole building. No consequence, no nothing. Again, game over, and my clients would not get anything from that element of consideration. Now, something is meant by the, my clients believe that, and have, and there is still, and this is 3.4, there are still questions saying that there are indeed payments made under the other two categories, which would give rise to the seller's payout share. But this particular event generated a value sufficient to generate the maximum payout share, avoiding the necessity of not only the resultant effect of this, in other words, unwinding this transaction if we accept that this didn't trigger it, then we have to, all of the potential that this provision was intended to avoid, will now have to be inquired into and litigated in addition to claims under the other two categories. Your time is up, Mr. Randall.  Thank you, Your Honor. Ms. Phelps. May it please the Court. Counsel. Judges, this case involves interpretation of contract language. That's typically a question of law appropriate for disposition on summary judgment. The parties both agree that the language is unambiguous. What they disagree on is the proper interpretation and application of that language. The plaintiffs maintain that the merger constituted a property distribution under the parties' agreement and that this triggered a payout obligation. And this argument is premised on Missouri's LLC statute, which provides that upon merger, the assets and liabilities of the non-surviving entity quote, transfer to, vest in, or devolve on the surviving entity. This case was disposed of on cross motions for summary judgment, and there are really just two issues for this Court to decide. First, did the merger constitute a property distribution under the parties' agreement? And second, if so, what was the value of that distribution? The trial court never reached the second issue because the court properly found that there was no property distribution under the agreement. But as this Court knows, you may affirm on any basis supported by the record, even if the trial court didn't get to that issue. So turning to the first issue, there was no property distribution under the agreement. Plaintiffs' briefs speak in terms of receipt and transfer. And at one point plaintiffs state that the sole issue is whether a transfer occurred. But that's not what the real issue is in this case. The issue is whether there has been a property distribution under the agreement as intended by the parties. And we contend that there was not. Now the first issue I'd like to address is the issue of condominiums. One of the things that Mr. Randall kind of glossed over in his initial argument and didn't get to until the very end is the parenthetical reference, i.e., condominium units. The agreement provides that the plaintiffs get a specified percentage of the value of any property distributions, parentheses, i.e., condominium units. Condos were the only property referenced in the contract. They were the only property contemplated by the parties when the contract was signed. The words in the parenthetical are words of limitation and enumeration. And they shed light on what the parties meant by property distribution. In this case, the parties intended to compensate the plaintiffs only if Parkside decided to distribute individual condos to a company affiliate in lieu of selling them to the general public. And the undisputed evidence shows that they didn't do that. No condos were distributed here. The I.E. versus E.G. argument. This is actually a pretty important argument because we're looking at what the parties meant by, i.e., condominium units. Plaintiffs maintain that the I.E. was used as an example rather than a specification. But throughout the parties' contract, like we cited in our brief, the parties used the abbreviation I.E. as a specification and limitation, not as an example. They use other references when they're trying to specify an example. For instance, they use E.G. They use words such as including and including but not limited to. And they also use the very clear wording of for example. That wording is actually used in the second payout provision in the payout agreements. So there's no question that the parties knew how to specify an example in their agreement. But here they intentionally chose I.E. and included the words condominium units to specify what property distribution meant. Your argument is that the use there of I.E. means that is? That is, correct. Exactly as the abbreviation I.E. is intended to do. We believe that this interpretation is consistent with the use of I.E. throughout the documents and also with the purpose and intent of the agreements. But even if this court were to find that I.E. did not mean a limitation or an enumeration, there was still no property distribution under the agreement. The fact is that TLG MOPEC didn't receive anything that it didn't already own. It was the sole member of Parkside. And as the sole member, it was also the sole owner of Parkside's property. So this alleged transfer of property was really fictional. Nothing transferred anywhere and no property was distributed. And importantly, TLG MOPEC didn't receive any economic benefit from this merger. Now the plaintiffs claim that the LLC was the technical owner of the property, not the members. And while the LLC may have been the technical owner of the property, because there was only one member, TLG MOPEC, TLG MOPEC, for all intents and purposes, was the owner of that property and could do anything and everything that an outright owner could have done with that property. Do you agree with opposing counsel's representation that under Missouri law, the members do not own the property? Yes, and that's what I mean by that the LLC was the technical owner of the property. So you concede that? I do concede that, yes. But the practicality of that is because there was only one member in that LLC, for all intents and purposes, they could have distributed the asset, they could have sold the asset, they could have done anything that the LLC itself could have done. Plaintiffs even acknowledged this in their brief and Mr. Randall acknowledged it up here. TLG MOPEC could have done what it wanted to with the property before the merger and after the merger. So nothing changed after the merger. The property was and remained TLG MOPEC's for its use and disposal. Now we've cited to a couple of Missouri cases that discuss the effect of a statutory merger on contractual language. And granted the contractual language in those cases is not identical to what we're talking about here. But in each of those cases, the courts found that a merger did not constitute a transfer for purposes of the contractual provisions at issue. We think those cases are applicable to the facts here as well. So let's talk about the purpose of the agreement. As this court knows, agreements are to be construed in accordance with their purposes and that words are not to be construed in a vacuum or in isolation. The purpose of these agreements was to allow the plaintiffs to share in any profits or financial benefits that were actually received by a company affiliate with respect to that property. So if TLG MOPEC didn't actually receive any profits or financial benefits from the fictionally transferred property, there's nothing for plaintiffs to share in. The payout obligation was conditioned upon Parkside's affiliates actually receiving a profit or an economic benefit from the transaction. Importantly, plaintiffs haven't identified a single profit or financial benefit that TLG MOPEC received from the merger. And instead of identifying one, they kind of sidestep this requirement and say the contracts don't require an economic benefit. That's irrelevant. But that ignores the fundamental purpose of the agreement. Plaintiffs also argue that the agreements themselves define what constituted a profit or an economic benefit. But that's not really what the agreements did. The agreements listed three identified categories of transactions that could trigger a payout obligation. But identification of those three categories does not end the inquiry. You still have to determine if a particular transaction fell within the scope of one of those three categories. That's exactly what we're doing here today. We're arguing about whether the merger constituted a property distribution. We believe that in order to answer that question, you have to look to the purpose of the agreement. Again, the purpose was to allow the plaintiffs to share in financial benefits received by company affiliates. What if TLG MOPEC decided to sell the entire building? Now? Now, after the merger, they decide to sell the building. What happens? We don't believe that that would trigger a payment obligation because we believe that it was limited to condominium units. But if we were wrong and that plaintiffs' court were to find that it wasn't limited to condominium units, assuming that that transaction fell within property distribution, TLG MOPEC would be on the hook for that. They would have to pay the payout obligation because they succeeded to the liabilities of Parkside as well. But there are no condominium units anymore, are there? Correct. There could be in the future. We don't know. Right now, it's a rental apartment building. But at the time this redevelopment agreement was entered into, the plan was to sell condominiums. Absolutely. And that was the only plan in mind. But if that plan changes and they're going to sell it just as a building as a whole, your position would be they're out. They don't get anything. Correct. And the explanation for my position is this. Of course, we're not at that anyway. We don't have to decide that. Sure. But the parties at the outset, they understood that the plan was to develop it into condos. They understood the risk that the condo project may never go forward. That was a risk they voluntarily undertook with respect to this conditional future payout liability. They specifically acknowledged that in the agreement. Flat out in the agreement, they said, we understand the condo project may not go forward, and we may not receive anything other than the guaranteed minimum amount. That's specifically in the agreement. So it may seem illogical at first on the surface that they would agree to limit that to condos, the first provision. But the fact remains, the plans are still suing my clients for the other two payouts under the other two provisions, which Justice Polk brought up, in the trial court. So this is not the be-all, end-all, end-of-game for the plaintiffs, as Mr. Randall is suggesting here. I'd also like to point out that it's equally illogical for my clients to agree to this conditional payout liability indefinitely. But that's what the agreements provide. My clients are on the hook for this conditional payout liability from now until eternity, or until the maximum payout share is paid out. That's the party's bargain. That's the agreement that they made. Just like the parties agreed to limit property distribution to condo units. And both parties agree that this court has to enforce the agreement as made. That's exactly what the trial court did when it granted summary judgment in favor of my clients. With respect to the second issue, let's assume that the merger could somehow be construed as a property distribution under the agreement. Summary judgment was still proper in favor of my clients because that alleged distribution had no value. The agreement requires a percentage, payout of a certain percentage of the quote value of the property distribution. The undisputed evidence presented to the trial court shows that at the time of the merger, the property was uninhabitable under local building codes, and it was over-encumbered by debt far in excess of the market value. There was more than $13.6 million in debt, and only $11.5 million in unencumbered market value of the property. So the property was underwater. There's no question about that. Because the value of the property distribution was a negative number, or zero in this case, we contend that there was no value to be received by the plaintiffs under the agreement. Plaintiffs would urge this court, as they did in the trial court, to use the market value rather than the net value of the transaction. But the contract doesn't say market value. Now, it also doesn't say net value, but the common understanding of the term value would account for any encumbering debt that the person receiving the property has to pay. Market value has a very specific meaning in the real estate business. It's not one and the same as regular value. And importantly, the parties to this transaction are all in the real estate business. What does market value mean? Market value means the value that would be paid by a willing buyer from a willing seller in exchange for a cash payment. Totally different type of transaction than we're talking about here, whereas a transfer by operation of law, property, an assumption of debt, lots of other things that don't fit within a technical definition of market value. Had the parties intended to look to the market value, they certainly knew what market value meant, and they could have used the term market value, but they chose not to. Now, use of the term market value rather than net value also ignores the fact that in this transaction at issue that we're looking at, not only did the property transfer, but so did the debt that was on that property. It was all one and the same part of the exact same transaction. It was separate. So all of the debts on the property came to TLG MOPEC at the same time that the property did. Factoring in the debt on the property and the computation of value is also in accord with the purpose of the agreement. Again, the purpose of the agreement is key in interpreting a contract. And again, the purpose here was to allow the plaintiffs to share in benefits actually received by the company affiliate. Because TLG MOPEC inherited not only the property, but also that overwhelming debt on the property, that debt impacted and dictated the amount of financial benefits that were actually received by TLG MOPEC. Because that debt far exceeded the property value, the property was essentially worthless at the time of the merger, and there was no value in this transaction. So we believe the value of any alleged property distribution as a result of the merger would have been zero, and it would not have triggered a payout obligation. So for that additional reason, we think the summary judgment was properly entered in favor of the defendants. One final issue that was brought up in the briefs is the issue of the allocation of principal versus interest. TLG MOPEC and Parkside had made some previous payments already. Plaintiffs are looking to have those payments allocated to interest because they contend the merger triggered a payout obligation and so interest was accruing. I'm not going to spend a lot of time on this. I just want to say that first, we don't think that the merger triggered a payout obligation, so any payments that have been made to date would be allocated to principal, not interest. Secondly, we don't believe that plaintiffs met their burden of establishing the absence of a dispute of fact as to this issue. This is an issue that they bore the burden of proof as the claimant on. We don't think that they met that burden of proof. So in conclusion, plaintiffs have adopted a hyper-technical interpretation of the parties' agreement that evades the intent of the parties and the purpose of the agreement. Contracts are to be interpreted in a manner that is fair, practical, and reasonable. We believe that plaintiffs' approach is anything but that. The parties never intended for a fictional transfer of property via merger to trigger a payout obligation as a property distribution. The parties never intended for the contract to trigger a payout obligation where the fictionally transferred property had a negative value to the transferee. The undisputed evidence established that no payout obligation was triggered by the merger. And for all of these reasons, the trial court properly granted summary judgment in favor of defendants and properly denied summary judgment in favor of plaintiffs. For that reason, we ask that the court affirm the trial court's order in its entirety. Thank you, counsel. Mr. Randall, any rebuttals, sir? Yes, Your Honor. Okay. Mr. Randall, there's no provision in the contract relating specifically to what would happen if the company merged with another company, is there? Not specifically, Your Honor. In talking, listening to counsel's argument about, well, we receive no value, that brings up exactly why the contract that we're talking about provided, defined what we mean by profit and financial benefit as these elements of the contract. We said we, our purpose is for them to share in it. How they share in it and what triggers the fee is defined by the contract. And the reason it's used as value of the property rather than net value, as net value is used in at least three instances was because of something that counsel alluded to. She said, well, the building is sitting there empty and it doesn't have anything and now it has $13 million in debt. What the parties were trying to do, this was part of their purchase price. What they were trying to do is create a simple element whereby when these transfers were made, when you elect to pass the property from the original entity to, and they were made company affiliates. Members were made. The reason both sides brought up, yes, they did bring up these 100% ownership, but it is for this very concern. Counsel's argument raises the very concern that this provision is in. $13 million, but it's not worth anywhere near that. Where did the money go? The interpretation we have was forward to avoid that very type of intricate accounting and allocation. It's straightforward. If you transfer the property to a company affiliate, we don't want to get involved in how much debt you run up. That's why the term value is put in there. The IE and EG, just as both made a good point, they would agree that they would get no profit. No matter what the seller, because the buyer happened to be talking about condominium units, they could the next day transfer it, lock, stock, and barrel, turn around and sell it, and my clients would get nothing. In fact, they could go ahead and just then develop it in condominiums and not get anything from it. These provisions, the IE provisions, EG, I'll have to confess, and I think I made that mistake in the brief, they're confusing. I would point out, just as an example, in one of the instances cited as an example of how EG was used, it was seller and his agents can inspect, and then it had in parens, IE, attorneys and accountants, now if we take that same literal approach we're doing here, then the sellers, agents, employees, and in-house people, if they weren't accountants and attorneys, couldn't look at it. So I don't think that was intended as that limitation. Thank you. Thank you, counsel. We'll take this matter into the advisory meeting and recess for a few moments.